UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 05-0386-05 (ESH) |
| | : | |
| v. | : | |
| | : | Judge Ellen Segal Huvelle |
| Michael Huggins | : | |
| | : | |
| Defendant. | : | |

**RESPONSE OF THE UNITED STATES TO DEFENDANT
HUGGINS APPEAL OF DETENTION ORDER**

*COMES NOW*, the United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, and in response to defendant Huggins' Appeal of Detention order says as follows:

**I. FACTS**

Huggins has been indicted by a grand jury in a Second Superseding indictment on one count of Conspiracy to Distribute and Possess With Intent to Distribute 5 Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base. Given the defendant's prior criminal history he is facing a minimum mandatory sentence of at least 20 years, possibly life. The Court has already heard a number of detention appeals in this matter and has reviewed the government's detention proffer which was made a part of the record in Huggins' hearing before the Magistrate Judge. The government adopts that document as part of this pleading. In addition the government proffers the following additional facts to the court.

**A. The Second Superseding Indictment**

The second superseding indictment lays out a recurring pattern with Jones distributing drugs to various conspirators, including Huggins, and collecting payment from the same coconspirators. Periodically during this cycle Jones would visit a stash house at 9508 Potomac

Drive in Ft. Washington, Maryland, the same location where 100 kilograms of cocaine and crack and over $800,000 were found when search warrants were executed on October 25, 2005.

During these visits Jones would meet with his suppliers and exchange money for drugs. The trips to the stash house by Jones can be quite accurately documented by a Global Positioning Device that was placed on Jones primary vehicle toward the end of September. The second superseding indictment lays out this picture in abbreviated form, starting with the activation of the GPS device in the fourth week of the wire intercept. The portion of the second superseding indictment detailing the daily pattern are set forth below with references to Huggins underscored.

   5. On or about September 27, 2005, at approximately 8:48 p.m., **JONES** and **HUGGINS** had a coded conversation in which **HUGGINS** indicated a drug customer would pay him the next day, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid.

   6. On or about September 27, 2005, at approximately 8:49 p.m., **JONES** and **JOHNSON** had a coded conversation in which **JOHNSON** indicated he was trying to collect some drug payments, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid.

   7. On or about September 27, 2005, at approximately 9:26 p.m., **JONES** and an unindicted co-conspirator, whose identity is known to the Grand Jury, had a coded conversation in which the co-conspirator said it was trying to collect payments, and **JONES** in turn stated he wanted to pay his suppliers.

   8. On or about September 27, 2005, at approximately 9:50 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 41 minutes.

9. On or about September 28, 2005, in the afternoon, **JONES** and **HOLLAND** had a coded conversation in which they discussed the possibility that **JONES** would have more cocaine available.

10. On or about September 28, 2005, at approximately 5:00 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, spoke in a coded conversation concerning when cocaine would arrive.

11. On or about September 28, 2005, at approximately 5:30 p.m., **JONES** and **HUGGINS** had a coded conversation concerning whether **HUGGINS** had any money to give to **JONES**.

12. On or about September 28, 2005, at approximately 5:30 p.m., **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury. In two coded conversations, they discussed the status of cocaine sales and money collection.

13. On or about September 28, 2005, at approximately 5:36 p.m., **JONES** and an unindicted co-conspirator, whose identity is known to the Grand Jury, had a conversation concerning the status of the co-conspirator's drug sales.

14. On or about September 28, 2005, at approximately 5:37 p.m., **JONES** and **JACKSON** had a coded conversation concerning cocaine supplies and money.

15. On or about September 28, 2005, at approximately 5:40 p.m., **JONES** and **CARTER** had a coded conversation in which they discussed the status of **CARTER**'s drug supply and **JONES** picking up money from **CARTER**.

16. On or about September 28, 2005, at approximately 7:00 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the

Grand Jury, spoke concerning the arrival of a shipment of drugs.

17. On or about September 28, 2005, at approximately 8:49 p.m., **JONES** and **JOHNSON** had a coded conversation in which **JONES** indicated that drugs had arrived.

18. On or about September 28, 2005, at approximately 9:35 p.m., **JONES** visited the stash location located at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 41 minutes.

19. On or about September 29, 2005, at approximately 7:33 a.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 15 minutes.

20. On or about September 29, 2005, at approximately 7:34 a.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he would meet the source in 15 minutes.

21. On or about September 29, 2005, at approximately 8:26 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 42 minutes.

22. On or about September 30, 2005, at approximately 9:25 a.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 10 minutes.

23. On or about September 30, 2005, at approximately 9:26 a.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he

would meet the source in 10 minutes.

24. On or about September 30, 2005, at approximately 9:49 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

25. On or about October 1, 2005, at approximately 7:04 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 15 to 20 minutes.

26. On or about October 1, 2005, at approximately 7:08 p.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he would meet the source in 10 minutes.

27. On or about October 1, 2005, at approximately 7:56 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

28. On or about October 3, 2005, at approximately 7:16 p.m., **JONES** and **BREMEA** spoke about meeting.

29. On or about October 4, 2005, at approximately 10:56 a.m., **JONES** and **BREMEA** spoke about meeting in the next 15-20 minutes.

30. On or about October 4, 2005, at approximately 11:20 a.m., **JONES** told **BREMEA** that **JONES** would be at the stash location in 10 minutes.

31. On or about October 4, 2005, at approximately 11:33 a.m., **JONES** and **BREMEA** met at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 12 minutes.

32. On or about October 4, 2005, at approximately 4:25 p.m., **JONES** and **BREMEA** spoke in a coded conversation about the arrival of a quantity of cocaine.

33. On or about October 7, 2005, at approximately 3:23 p..m., **JONES** and **BREMEA** spoke in a coded conversation about the anticipated arrival of a quantity of cocaine the next day.

34. On or about October 8, 2005, at approximately 11:26 a.m., **JONES** and **BREMEA** spoke in a coded conversation, in which **BREMEA** told **JONES** that the drug shipment had been delayed and would probably not be arrive until Monday (October 10). They agreed to meet in 15 -20 minutes.

35. On October 8, 2005, at approximately 11:59 a.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 38 minutes.

36. On or about October 8, 2005, at approximately 7:38 p.m., **JONES** told <u>**HUGGINS**</u> in a coded conversation that the cocaine shipment had been delayed.

37. On or about October 9, 2005, at approximately 11:14 a.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** told **JONES** that he would call **JONES** as soon as the cocaine arrived.

38. On or about October 10, 2005, at approximately 7:08 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, had a conversation in which the source indicated something would be happening in seven or eight days.

39. On or about October 10, 2005, at approximately 9:30 p.m., **JONES** had a conversation with **BREMEA**, who told **JONES** that someone would be arriving in about four hours.

40. On or about October 11, 2005, at approximately 7:40 a.m., **JONES** and **BREMEA** spoke in a coded conversation, in which **BREMEA** told **JONES** that he had cocaine, and they agreed to meet in approximately 25 minutes.

41. On or about October 11, 2005, at approximately 8:00 a.m., **JONES** and **HOLLAND** discussed meeting.

42. On or about October 11, 2005, at approximately 8:00 a.m., **JONES** and **JOHNSON** discussed meeting.

43. On or about October 11, 2005, at approximately 8:40 a.m., **JONES** and **JACKSON** discussed meeting.

44. On or about October 11, 2005, at approximately 8:40 a.m., **JONES** and **BREMEA** spoke and agreed to meet in approximately 10 minutes.

45. On or about October 11, 2005, at approximately 9:09 a.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 45 minutes.

46. On or about October 12, 2005, at approximately 12:36 p.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** indicated that a shipment of cocaine would be arriving the next day in the evening.

47. On or about October 12, 2005, at approximately 12:45 p.m., in a coded conversation, **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury and told it that a cocaine shipment was expected the next day.

48. On or about October 12, 2005, at approximately 1:41 p.m., **JONES** and **HUGGINS** had a coded conversation in which **JONES** told **HUGGINS** that the shipment of cocaine was arriving "tomorrow."

49. On or about October 12, 2005, at approximately 3:06 p.m., **JONES** and **JACKSON** had a coded conversation in which **JONES** told **JACKSON** that the shipment was arriving tomorrow.

50. On or about October 13, 2005, at approximately 12:45 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** stated that he had to make some "runs" but that they could meet in 30 minutes.

51. On or about October 13, 2005, at approximately 5:25 p.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** indicated that a shipment of cocaine would be arriving at approximately 8:00 o'clock that evening.

52. On or about October 13, 2005, at approximately 7:13 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** stated that he was five to 10 minutes away.

53. On or about October 13, 2005, at approximately 7:19 p.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, until approximately 7:47 p.m.

54. On or about October 13, 2005, at approximately 7:47 p.m., **JONES** called **HOLLAND**.

55. On or about October 13, 2005, at approximately 7:49 p.m., **JONES** called **JOHNSON.**

56. On or about October 13, 2005, at approximately 7:51 p.m., **JONES** called

**HUGGINS**.

57. On or about October 13, 2005, at approximately 7:53 p.m., **JONES** called an unindicted conspirator, whose identity is known to the Grand Jury.

58. On or about October 14, 2005, at approximately 7:01 a.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour.

59. On or about Wednesday, October 19, 2005, at approximately 11:15 a.m., one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, left a coded message for **JONES** that a shipment of cocaine would be arriving on Thursday or Friday.

60. On or about Wednesday, October 19, 2005, at approximately 11:16 a.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, spoke and the source reiterated that a shipment of cocaine would be arriving on Thursday or Friday.

61. On or about October 19, 2005, at approximately 5:19 p.m., **JONES** and **BREMEA** had a conversation in which **BREMEA** stated that he was home, and **JONES** stated that he would call him later.

62. On or about Thursday, October 20, 2005, at approximately 6:25 p.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 20 minutes.

63. On or about October 23, 2005, at approximately 8:00 p.m., **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury, and stated in a coded reference that he had to make contact with his customers because cocaine was available.

64. On or about October 23, 2005, at approximately 8:10 p.m., **JONES** and **<u>HUGGINS</u>** spoke in a coded conversation in which **JONES** indicated that cocaine was available and they agreed to meet.

65. On or about October 23, 2005, in the evening, **JONES** and **<u>HUGGINS</u>** met to further a cocaine transaction.

66. On or about October 23, 2005, at approximately 9:12 p.m., **JONES** left **CARTER** a message to call him because something was "here."

67. On or about October 23, 2005, in the evening, **JONES** and **CARTER** met to further a cocaine transaction.

68. On or about October 23, 2005, in the evening, **JONES** met with an unindicted conspirator, whose identity is known to the grand jury, who gave **JONES** approximately $20,000, as advanced payment for a kilogram of cocaine.:

### B. The First Three Weeks of the Intercept

Although the second superseding indictment lays out the intercepted calls involving Huggins and other co-conspirators in detail beginning with the GPS data there are essentially identical calls in the first three weeks of the intercept, including numerous calls with Huggins.

### C. The Search on October 24, 2005

When a search warrant was executed on Huggins' residence at 5119 Barto Road on October 24, 2005, the defendant and his wife were not at home. However the defendant's teenage stepson verified that the defendant and his wife stayed in the master bedroom of the home. Located in that room was approximately 125 grams of cocaine, a digital scale, and $10,750 in cash. There was also a variety of paper work in the defendant's name.

**D. The Defendant's Prior Record**.

The Court has already requested and received a report dated December 12, 2005 from the United States Probation Office detailing the defendant's criminal record. To summarize that report.

In 1984 the defendant was searched pursuant to the stop of a vehicle in which he was riding. He was found to be in possession of 15 bags of marijuana and a pocket knife. He received a suspended sentence, which was later set aside, for possession of a dangerous weapon.

In 1988 a search warrant was executed on an apartment in the District of Columbia. The defendant was located in the bedroom. Also present in the apartment was a sawed off shotgun, ammunition for a .45 caliber gun, a large quantity of marijuana, and $545 in cash. In a vehicle which the defendant had been seen driving up to the apartment officers found a .45 caliber gun and 36 ziplock bags of marijuana. The defendant was convicted of possession of the sawed off shotgun and possession with intent to distribute marijuana. He received a 5 year probationary sentence which was terminated unsuccessfully when the defendant was convicted on his next offense.

In September 1992 the defendant visited an inmate in the Federal Prison at Petersburg, Virginia. When the inmate was searched subsequent to the visit he was found to be in possession of .195 grams of 87% pure heroin. Based on this incident Huggins was convicted of providing contraband to an inmate and received a sentence of 78 months incarceration. He was released from prison on that offense in August of 1999 and completed a term of supervised release in August 2001.

Huggins thus has at least one prior felony drug conviction for possession of marijuana in

1988. The smuggling contraband offense is also obviously a felony involving heroin, but the government has not yet researched whether it counts as a drug offense for purposes of enhancements under 21 U.S.C. 846. If only one of the felonies is counted for enhancement purposes and the government files a notice under 21 U.S.C. 851 the defendant will face a minimum mandatory sentence of 20 years if convicted of a conspiracy involving more the 5 kilograms of cocaine and/or 50 grams of cocaine base. If both prior offense count as drug felonies the minimum mandatory sentence will be life.

### E. The Government's Total Case Against Huggins

The Grand Jury's return of an indictment is of course a finding of probable cause. But in the context of this detention appeal it may be worth touching a bit on the overall nature of the evidence the government anticipates. As already described the defendant was intercepted on a number of drug related phone calls with Jones. The pattern, not only of calls between Jones and Huggins but calls between Jones and other coconspirators and trips to the stash house seems to leave very little question about what was going on.

It is fair to point out that the calls intercepted are coded. However, the government anticipates that a number of former members of Jones' organization will testify about the kinds of codes that Jones employed. Several of these witnesses also have specific knowledge about Huggins drug activities with Jones. Huggins coded conversations also should be interpreted in light of the seizure of cocaine, paraphernalia and a significant amount of cash in his bedroom.

## **ARGUMENT**

In considering this appeal it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released.... The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . ***This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.***

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3486-3487. (Emphasis added.)[1]

---

[1] The Court must always consider whether defendant's release is a danger to the community. This point is made throughout the Bail Reform Act. Section 3142(e), which authorizes detention without bail pending trial, which reads:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, such judicial officer ***shall order*** the detention of the person before trial.

Emphasis added. Similarly, § 3142(f) reads:

> The judicial officer shall hold a hearing to determine whether any condition of combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person ***and the safety of any other person and the community*** –
>    (1) upon motion of the attorney for the Government, in a case that involves,
>       (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act

No condition of release nor combination of them can ensure that the defendant will not pose a danger to the community if released. This is based first upon the presumption to that effect written into the Bail Reform Act. 18 U.S.C. § 3142(e) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions of release will reasonably assure the . . . safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act."). This presumption, triggered by indictment, is reinforced overwhelmingly by the facts of this case.

The defendant is a significant member of a drug organization with two prior drug related felony convictions and a conviction for possession of a sawed off shotgun. And this is a defendant who while on probation for a drug felony smuggled heroin into an inmate in a federal prison. The facts laid out highlight the danger that Huggins' release would pose . As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to

---

(21 U.S.C. § 801 *et seq*.) . . .

Emphasis added. This point is again made in § 3142(g), **Factors to be considered**, which states:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, take into account the available information concerning –
>     (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>     (2) the weight of the evidence against the person;
>     (3) the history and characteristics of the person . . .
>     (4) ***the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .***

(Emphasis added.)

> the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . . The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

S.Rep. No. 225, *supra*, at 3195-3196.

Against these facts, the defendant relies on community ties to overcome the presumption that he should be held pending trial. Again, the framers of the 1984 Bail Reform Act thought differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community." S.Rep. No. 225, supra, 3207. Nor is it clear why community ties, which did not stop Huggins from selling drugs as described above, will keep him from doing so now.

Counteracting the representations made by the defendant is the seriousness of the charges he faces, and the strength of the government's evidence, which the Court must also consider in determining whether the defendant has overcome the presumption that there are no conditions of release that would ensure the safety of the community. 18 U.S.C. § 3142(g). The government has numerous wire interceptions capturing the defendant discussing drug trafficking with his supplier, Antoine Jones. There is the seizure of narcotics and trafficking paraphernalia from the defendant's residence, along with the seizure from the group's stash house of 97 kilograms of cocaine, 3 kilograms of crack, and close to $1 million in cash. And, finally there is the defendant's criminal history, including a drug offense committed while Huggins was on probation for a drug felony.

In summary, the defendant's release would constitute a clear danger to the community. The Magistrate Judge's decision to detain the defendant should be upheld.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
DC Bar No. 451058

_____
RACHEL CARLSON LIEBER
Assistant United States Attorney
DC Bar No. 456-491
555 Fourth Street, N.W.
Room 4820
Washington, DC 20530
(202) 353-8055

JOHN V. GEISE
Assistant United States Attorney
DC Bar No. 358-267
555 4th Street, N.W., Room 4126
Washington, DC 20530
(202) 616-9156

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing Motion has been served, by electronic mail, on Joseph, Esq., counsel for defendant Huggins, on this ___ day of March, 2006.

 

_____
John V. Geise
Assistant United States Attorney